# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of - | ) | |
| | ) | |
| Sauer, Inc. | ) | ASBCA No. 61847 |
| | ) | |
| Under Contract No. N40085-09-D-5026 | ) | |

APPEARANCE FOR THE APPELLANT:     Jack Rephan, Esq.
                                               Pender & Coward, P.C.
                                               Virginia Beach, VA

APPEARANCES FOR THE GOVERNMENT:     Craig D. Jensen, Esq.
                                                    Navy Chief Trial Attorney
                                                    Devin A. Wolak, Esq.
                                                    Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE EYESTER

Sauer, Inc. (Sauer or appellant) appeals a deemed denial of a certified claim concerning the construction of a multi-story barracks in Hampton Roads, Virginia, pursuant to a task order issued by the Naval Facilities Engineering Command (NAVFAC or government). Sauer submitted the claim on behalf of itself and its subcontractor for money and time delay. The parties have agreed to waive a hearing and have the appeal decided on the written record pursuant to Board Rule 11. Both parties have filed briefs in support of their respective positions.[1] We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. For the reasons set forth below, the appeal is sustained in part and the remainder is denied.[2]

---

[1] Appellant's prayer for relief in its opening brief contained a request for attorney's fees under the Equal Access to Justice Act (EAJA) (app. br. at 44). However, a request for attorney's fees under EAJA is inappropriate during the briefing stage of the appeal, and would require a separate application pursuant to Addendum I of the Board's rules after the disposition of the appeal has become final.

[2] The parties jointly stipulated entitlement regarding two issues under this appeal. The first issue, for work related to the Condenser Water Loop tie-in (Count IV), the parties agreed that appellant should be awarded $23,000 for this portion of its claim. The second issue, relating to Modification No. 004 (Mod. 004) for Electrical Equipment Change (Count V(b) extended overhead), was also resolved in favor of the appellant in the amount of $62,299.72. Thus, the parties requested that the Board's final judgment include the previously agreed upon amounts. (Joint status rpt. 1/29/2021 at 1) Accordingly, this decision deals with the remaining issues under the above-captioned appeal.

FINDINGS OF FACT (FOF)

Background

1.  On December 3, 2008, NAVFAC awarded Contract No. N40085-09-D-5026 to Sauer.  The contract was a Design Build/Design Bid Build Multiple Award Construction Contract (MACC)[3] for New Construction, Renovations, Alterations, and Repair Projects for Facilities in Hampton Roads, Virginia.  (R4, tab 1 at 1294)[4]

2.  The MACC included the following clause:

> 5252.201-9300 CONTRACTING OFFICER AUTHORITY
> (JUN 1994)
>
> In no event shall any understanding or agreement between the Contractor and any Government employee other than the Contracting Officer on any contract, modification, change order, letter or verbal direction to the Contractor be effective or binding upon the Government.  All such actions must be formalized by a proper contractual document executed by an appointed Contracting Officer.  The Contractor is hereby put on notice that in the event a Government employee other than the Contracting Officer directs a change in the work to be performed, it is the Contractor's responsibility to make inquiry of the Contracting Officer before making the deviation.  Payments will not be made without being authorized by an appointed Contracting Officer with the legal authority to bind the Government.

(R4, tab 1 at 1312)  The MACC also incorporated by reference Federal Acquisition Regulation (FAR) 52.243-4, CHANGES (JUN 2007), and FAR 52.246-12, INSPECTION OF CONSTRUCTION (AUG 1996) (R4, tab 1 at 1303).

3.  On October 31, 2013, NAVFAC issued fixed-price Task Order No. 0005 to Sauer in the amount of $27.406 million and with a completion date of December 16, 2015, for the design and build of a multi-story barracks for enlisted technical training students at the Naval Air Station Oceana, Virginia Beach, Virginia[5] (R4, tab 1.5 at 1193-95, tab 1.6 at 1211-12, tab 1.1 at 1072).  NAVFAC issued the task order

---

[3] Pursuant to an Order of the Board, the parties provided a copy of the MACC and included it as part of the government's Rule 4 file.

[4] We cite to the "Bates stamp" type of pagination affixed by the parties.

[5] The award included other line items for planned modifications that are not relevant to the decision here (R4, tab 1.5 at 1195-97, tab 1.6 at 1212-1214).

pursuant to Sauer's MACC, which stated that the task order was subject to the MACC's terms and conditions (R4, tab 1 at 1305).

4. The task order required Sauer to "provide all labor, supervision, engineering, materials, equipment, tools, parts, supplies and transportation to accomplish the work in accordance with" the solicitation (including the amendments); Sauer's proposals submitted November 1, 2012 and August 13, 2013; and the final design (R4, tab 1.5 at 1194, tab 1.6 at 1211, tab 1.0 at 70).

5. The incorporated solicitation included four parts. As relevant here, part 3, the engineering system requirements (ESR), set forth the project's specific requirements. Part 4, the performance technical specifications (PTS), provided "generalized technical requirements that apply to multiple facility types and include more requirements than are applicable to this project" (*see generally* R4, tab 1.0 at 500).

6. The task order required Sauer to establish and maintain a quality control (QC) program that used, among other things, a submittal review and approval process and "QC certifications and documents necessary to provide design, materials, equipment, workmanship, fabrication, construction and operations which comply with the requirements of" the task order (R4, tab 1.0 at 100). There were procedures for both design and construction submittals (R4, tab 1.0 at 45, 53).

7. Some submittals required government review and approval while others required either a QC certification and designer of record review and approval, or QC approval and copy sent to the designer of record (R4, tab 1.0 at 6; app. supp. R4, tab 4.2 at 4022). A QC certification for a submittal affirmed that the submittal complied with the task order requirements (R4, tab 1.0 at 47, 51, 56-57).

8. The task order required design documents created by Sauer to comply with the solicitation (R4, tab 1.0 at 55). In addition, Sauer was to provide all design submittals, including specifications, to the government for approval (R4, tab 1.0 at 55-56).

9. The task order set forth the procedures for design changes and variations. A design change was to be considered prior to government approval of the final design and a variation was to be considered after government approval of the final design (R4, tab 1.0 at 49). A design change was required to "meet the minimum requirements of the solicitation and the accepted proposal" and could be approved by the designer of record and brought to the attention of the government before being incorporated into the design documents. In contrast, the task order stated the following with respect to variations:

> Variations from contract requirements including the
> solicitation, the accepted proposal, and the final design,
> require Government approval. Variations to the contract
> requirements must be approved by the Designer of Record

3

> prior to resubmitting the design to the Government for
> approval of the variation.

(R4, tab 1.0 at 50)[6]

10. Sauer's designer of record for the award was VOA Associates Inc. (R4, tab 1.3 at 1131). VOA entered into a subcontract with Hankins & Anderson to serve as the mechanical, electrical and plumbing engineer for the project (app. supp. R4, tab 4.15, Forbes decl. ¶ 3). Sauer also entered into a subcontract with Smith & Keene Electrical Service, Inc. (S&K) to furnish and install the plumbing, and the heating, ventilating and air conditioning (HVAC) work required under Sauer's task order (app. br. ¶ 2).

11. On May 8, 2018, Sauer submitted a claim to the contracting officer pursuant to the Contract Disputes Act (R4, tab 2 at 2001). Sauer submitted the claim on behalf of itself and its subcontractor S&K regarding costs incurred: (a) in removing and replacing Polyvinyl Chloride (PVC) pipe for the building's above ground waste pipe system; (b) for the government's failure to resolve, in a reasonable amount of time, the issue of whether the specifications allowed press-on fittings; and (c) for the government's change in task order requirements when it ordered Sauer to install balancing dampers in the ceiling duct above the toilets and showers (R4, tab 2 at 2003-08). Sauer also requested an adjustment to the final completion date of 44 days (R4, tab 2 at 2001).

12. The contracting officer stated that she would issue a final decision on or before October 9, 2018 (R4, tab 3 at 3002). On October 11, the contracting officer stated that she would issue a decision on or before January 9, 2019 (R4, tab 3 at 3003). On October 18, 2018 Sauer filed a notice of appeal with the Board.

Count I - PVC vs. Cast Iron Piping for Above Ground Waste Systems

13. The ESR for the project's plumbing system stated at paragraph D203001, Waste Pipe and Fittings, that the contractor was to "[p]rovide cast iron hub and spigot or hubless pipe and fittings with rubber compression gasket joints for above ground installation" (R4, tab 1.0 at 250). Paragraph D203002, Vent Pipe and Fittings, also required the contractor to "[p]rovide cast iron hub and spigot or hubless pipe and fittings," and that "[p]lastic PVC piping, fittings, and solvent cement may be provided in lieu of cast iron for vent piping only" (R4, tab 1.0 at 250-51).

14. The corresponding paragraph in the PTS, paragraph D203001, Piping and Fittings, stated the following:

> Cast iron hub and spigot pipe and fittings, rubber
> compression gasket joints or cast-iron hubless pipe and

---

[6] The task order uses the term contract rather than task order in many instances.

fittings, CISPI 301 with CISPI 310 couplings.  Where indicated in ESR Section D20, plastic PVC or ABS piping, fittings, and solvent cement . . . may be provided . . . .

(R4, tab 1.0 at 508)

15.  Sauer's November 1, 2012 proposal, which was incorporated by reference into the task order, set forth the same requirements regarding sanitary waste and vent piping.  Specifically, Sauer's proposal stated that "[s]anitary piping material will be cast iron.  Vent piping will be either cast iron or PVC per the [request for proposals (RFP)]" (R4, tab 1.3 at 1140).  Sauer's August 13, 2013 revised proposal stated the same (R4, tab 1.4 at 1173).

16.  The initial design submittal for the building, dated April 14, 2014, stated that cast iron soil, waste and vent piping shall be installed (R4, tab 2 at 2364, 2326).  However, the initial design document stated at Table I, Pipe and Fitting Material for Drainage, Waste and Vent Piping Systems, that cast iron soil and pipe fittings *or* PVC plastic drain, waste and vent pipe and fittings can be used for above ground soil, waste, and drain in buildings (R4, tab 2 at 2381).

17.  The final design submittal signed by Sauer and dated September 10, 2014, stated that cast iron soil, waste and vent piping shall be used (app. supp. R4, tab 4.2 at 4013, 4042).  The final design further stated that materials for the various services "shall be in accordance with TABLES I and II" (app. supp. R4, tab 4.2 at 4026).  Table I, Pipe and Fitting Material for Drainage, Waste and Vent Piping Systems, stated that *only* cast iron soil pipe and fittings were to be used for above ground soil, waste, and drainage in buildings (app. supp. R4, tab 4.2 at 4059).  We find that although the initial design document allowed for the use of PVC for above ground waste piping, Sauer was to perform work on the project in accordance with the solicitation, Sauer's proposals, and the final design and these documents all required Sauer to utilize cast iron for the above ground waste piping systems.

18.  Despite this well-defined task order requirement, on February 3, 2015, S&K informed Sauer that PVC pipe is allowed for waste piping and due to the upfront savings on material, S&K offered a credit to use the PVC pipe.  S&K stated that the use of PVC instead of cast iron was being corrected as part of an upcoming architect's supplemental instruction (ASI).  (App. supp. R4, tab 4.4 at 4138)

19.  On February 18, Sauer submitted a design change order package to NAVFAC (app. supp. R4, tab 4.4 at 4066).  The change order package included a letter from S&K to Sauer stating that the final design inadvertently removed the specification permitting PVC piping for above ground sanitary waste systems, and was being corrected as part of an upcoming ASI.  The letter also stated that schedule 40 PVC is allowed for sanitary waste systems and has been used above and below slab successfully on many NAVFAC

projects.  (App. supp. R4, tab 4.4 at 4138)  There is nothing in the record showing that NAVFAC approved this design change order package.  Further, the task order required design changes meet the minimum requirements of the solicitation (R4, tab 1.0 at 50). This design change order package did not meet the minimum task order requirement for the use of cast iron for the waste piping system.  In addition, since it was not approved by the contracting officer, Sauer could not incorporate this change, which was a variation to the task order requirements, into the design documents without government approval.

20.  Prior to April 2015, VOA drafted ASI 004.  ASI 004, which was unsigned, stated:

> During the pre-final submittal dated 4/14/2014 the specification section 3.13 table I & II had PVC as an acceptable aboveground and underground material for sanitary waste along with storm drain and aboveground/underground vent.  PVC was a product substitution that was agreed to as part of a discussion with the Navy project team in the design review meetings.
>
> The resubmission of the pre-final submittal dated 5/30/2014 had inadvertently removed several items including PVC as a viable option.  The specifications need to be changed to reflect the pre-final submittal dated 4/14/2014.

ASI 004 also addressed mop basins which were changed to service sinks and miscellaneous changes to schedules.  (R4, tab 2 at 2322)

21.  NAVFAC received a copy of ASI 004 in April 2015 (see R4, tab 2 at 2324). In an email dated April 5, 2015, a mechanical engineer for Hankins & Anderson asked Daniel Crosby, the NAVFAC mechanical engineer, if he had any issues with ASI 004. David Yost, the NAVFAC architect, and Brandon Wade, the NAVFAC construction manager, were copied on the email.  (R4, tab 2 at 2311)  In response, Daniel Crosby stated, "no, I did not have any issues with it," and wanted to know why the mop basins were changed to services sinks (R4, tab 2 at 2310).  ASI 004 did not specifically request a variation to the specification concerning the use of cast iron for waste piping but stated only that the specifications needed to be changed.  Therefore, we find that Daniel Crosby's statement that he did not have any issues with "it" did not serve as an approval or agreement to a variance in task order specifications regarding the use of PVC instead of cast iron for above ground waste piping.

22.  Sauer included in the record a position description for a GS-12 mechanical engineer for NAVFAC dated January 10, 2013 to show Daniel Crosby's responsibilities. The position description states that the mechanical engineer serves as the Navy technical representative under the contracting officer's technical representative.  One of the many

duties assigned the mechanical engineer is to "[p]rovide[] the necessary advice and decisions required at the beginning of work and as problems develop . . . ." (App. supp. R4, tab 4.1 at 4003)  The position description does not state that the mechanical engineer approves variations submitted by a contractor under a contract or task order (*see* app. supp. R4, tab 4.1).  Accordingly, we find that Daniel Crosby, as the NAVFAC mechanical engineer for the project, did not have authority to approve variations to the task order specifications or requirements.

23.  Starting in April 2015, S&K installed PVC pipe for the above ground waste systems (R4, tab 2 at 2004).  In early June of 2015, Sauer provided a plumbing submittal designated as SD-03 for architect approval (app. supp. R4, tab 4.6 at 4145; tab 4.15, Forbes decl. ¶ 5).  Submittals labeled with code SD-03, Product Data, did not have to be approved by the government but required Sauer's QC certification and designer of record approval (app. supp. R4, tab 4.15, Forbes decl. ¶ 4).  In addition, the final design stated the following for an SD-03, Product Data, submittal for the plumbing system:

> Diagrams, instructions, and other sheets proposed for posting.
> Manufacturer's recommendations for the installation of bell
> and spigot and hubless joints for cast iron soil pipe.

(App. supp. R4, tab 4.2 at 4023)

24.  Despite the task order requirements, including the final design, the SD-03 plumbing submittal Sauer submitted on June 1 for plumbing fittings, valves, accessories and backflows, stated the following:

> Section A: 220000 2.1 and 2.11 Aboveground and below
> ground plumbing systems for [drain, waste and vent (DWV)]
> pipe and fittings (schedule 40 PVC)

(App. supp. R4, tab 4.6 at 4149)  The submittal included the product literature for the PVC pipes used for the above and below ground plumbing systems for DWV pipe and fittings and is signed by Ed Forbes, Sauer's QC manager (app. supp. R4, tab 4.6 at 4146, 4150-51).  Hankins & Anderson approved the submittal and accepted the above ground and below ground plumbing systems for DWV pipe and fittings on June 8 (app. supp. R4, tab 4.6 at 4144).  VOA acknowledged the submittal on June 9, and marked it as revise and resubmit (app. supp. R4, tab 4.6 at 4143).

25.  A plumbing submittal for materials (*i.e.*, a submittal labeled SD-03, Product Data) did not require government approval; however, that is because such a submittal was required to comply with the solicitation requirements.  In other words, the products set forth in the plumbing submittal were to have met the minimum solicitation requirements.  Here, Sauer's plumbing submittal did not meet the minimum solicitation requirement to use cast iron for above ground waste piping and the QC manager or designer of record

7

should not have approved the submittal showing the use of PVC instead of cast iron pipe. Therefore, Sauer could not use a plumbing submittal for product data to vary the task order requirement to use cast iron pipe for above ground waste systems.

26. In an August 18 email between individuals from Sauer and its subcontractors, the Sauer project manager explained that the NAVFAC construction manager was concerned with the use of PVC instead of cast iron pipe for the above ground waste system. Specifically, NAVFAC's "primary concern using PVC is the sound transmission. [NAVFAC] suggested we present an alternative solution to their [c]ast [i]ron direction, and they would be open to discuss it with us." The Sauer project manager further stated that if Sauer "can demonstrate a similar, or greater level of sound protection can be achieved by sound proofing the PVC, we may be able to avoid tearing out the existing PVC." (App. supp. R4, tab 4.7 at 4197) In an email dated August 20, Sauer's QC manager Ed Forbes stated that he looked through the internet for opinions relating to the use of cast iron versus PVC pipe. One article noted that the greatest issue with PVC pipe is sound transmission. (R4, tab 2 at 2303) There is nothing in the record showing that Sauer or S&K proposed a plan, or even demonstrated to the government that sound proofing the PVC would provide a similar or greater level of sound protection than cast iron pipe.

27. On August 22, Sauer's QC manager Ed Forbes emailed several individuals, including Pavel Turenkov, the S&K director of operations. According to the email, the first correspondence Mr. Forbes had on the PVC for waste piping issue concerned ASI 004; Mr. Forbes asked if there was other correspondence on the matter. (R4, tab 2 at 2301) On August 24, 2015, S&K emailed Sauer and stated:

> I have my notes about the use of PVC in lieu of cast iron from the [concept design workshop] and 60% review, meeting we had at NAVFAC's office and 08/22/14 conference call during which Dan Crosby while talking in regards to condenser water piping material and insulation, said, quote: "I've approved PVC for sanitary but I'd never agreed to allow PVC for condenser water piping . . ." but I think you are looking for notes/emails by someone else because I'm the benefitting party. . . . If the AS1004 approval by Dan Crosby and the fact Brandon Wade has been inspecting PVC sanitary close to a year and has been sitting on credit for 7 months means nothing to Tom Hernandez and David Yost then notes, emails or even a conf. call recording produced by me won't matter either! It is a shame they took this position but I hope after everything we had presented, they can act honestly and in best interest of the end user who prefers PVC sanitary to cast iron due to constant multi-million maintenance issue on

another project and also in best interest of the project since above-ground sanitary piping is close to 40-45% being done.

(R4, tab 2 at 2300)

28. On August 27, 2015, the contracting officer emailed Sauer and stated:

> In response to the "Cast Iron vs PVC" issue, the government's decision is to leave the PVC that was installed underground, in place. However, Sauer is directed (per the RFP Part 3 Chapter 6 Section D203001 Waste Pipe & Fittings) to provide cast iron hub and spigot or hubless pipe and fittings with rubber compression gasket joints for above ground installation. PVC will be allowed for vent piping only.

(R4, tab 2 at 2307-08) Sauer states that as a result of the directive by the contracting officer, it had to remove 80 percent of the installed PVC pipe (R4, tab 2 at 2004).

29. According to the government, cost estimates and calculations were not required for the consideration or conclusion that preceded the government's remove/replace order concerning the PVC pipe. The government states that it is "undisputable" that the value of the project was lower with PVC piping by virtue of the contract credit for the use of PVC instead of cast iron pipe for below ground piping. (App. supp. R4, tab 4.10, interrogatory No. 8 at 4211) The government further states that it determined that PVC "is not the functional equivalent to cast iron piping for the relevant application" (app. supp. R4, tab 4.10, interrogatory No. 9 at 4211). The government states it considered the public interest when it modified the task order to allow for the use of PVC for below ground sanitary waste piping, where noise would not be an issue, but not above ground sanitary waste piping, where noise would be an issue (*see* gov't reply br. at 62).

30. On July 10, 2017, the agency issued Mod. 14 which decreased the total price of the task order (R4, tab 1.7 at 1291). Modification 14 stated that a "[proposed change] 039 Cast Iron Piping Credit" had been added as a result of a "Design Deficiency." The proposed change was to "[d]elete cast iron piping not required." The modification further stated that an extension of time was not required as a result of the modification. (R4, tab 1.7 at 1292) Modification 14 permitted the use of PVC pipe for underground sanitary waste systems only.

9

Count II - Press-On Fittings and Unreasonable Delays[7]

31.  The ESR for the plumbing system stated, at paragraph D202001, that the contractor was to provide "[c]opper tubing and fittings for above ground and buried piping . . . . Extruded and groove-type pipe and tube fittings shall not be used" (R4, tab 1.0 at 249).  The ESR did not specifically preclude or permit the use of press-on fittings for the copper tubing.

32.  The PTS that corresponded to the ESR paragraph at issue here—paragraph D202001, Pipes and Fittings—specifically allowed for the use of press-on copper fittings for copper tubing, as follows:

> Use copper tubing and fittings for pipe sizes 4 inches (100 mm) or smaller.  Use type L tubing above ground with either solder fittings, or press-on copper fittings.  For buried piping, use type K tubing with either solder fittings, or press-on copper fittings.

(R4, tab 1.0 at 505)  The task order stated that PTS requirements that "correspond [to] and further define the [ESR] requirements are specific to this project, other [PTS] requirements are not required" (R4, tab 1.0 at 500).

33.  In addition, the task order references the United Facilities Guide Specifications (UFGS), which the Navy argues controls here.  For example, the solicitation's part 2 general requirements states that UFGS sections referenced in the PTS are "required to be submitted as part of the design submittal" (R4, tab 1.0 at 47).  There are no UFGS sections referenced in the PTS relating to the issue here.

34.  However, part 2 of the solicitation also stated that Sauer "shall prepare design specifications that include a UFGS specification for each product, material, or system on the project" (R4, tab 1.0 at 60).  With respect to the UFGS sections, Sauer was to:

> Choose UFGS Sections that describe the products, materials, and systems that are used on the project.  Use current UFGS Sections that are available on the Whole Building Design Guide website and give priority to the UFGS sections that are prepared by NAVFAC.  Only use UFGS sections prepared by other Agencies if an applicable NAVFAC prepared specification section does not exist.

---

[7] The parties and documents refer to these type of fittings as press fittings, press-on or press-connect fittings.  According to the record, a special tool is used to fasten these type of fittings (R4, tab 2 at 2399).

(R4, tab 1.0 at 61)  Several references to the UFGS refer to the Whole Building Design Guide website, located at www.wbdg.org (*see, e.g.*, R4, tab 1.0 at 63).

35.  In addition, Sauer was to "[e]dit UFGS sections in accordance with RFP Part 4, PTS, Section Z-10, and Design Submittals" (R4, tab 1.0 at 60-61).  The PTS at section Z-10 states:

> UFGS Section 01 33 10.05 20, *Design Submittal Procedures* some PTS sections require[] the use of UFGS sections in the development of the contractor originated specification.  The Designer of Record (DOR) shall edit the UFGS sections for the project and submit the edited specification as a part of the design submittal. The DOR shall edit the UFGS as follows:
>
> (1) Prepare UFGS Specifications as part of the project specification,
> (2) Delete only portions of the UFGS specification that are not applicable to the project,
> (3) Edit only the bracketed choices that are within the UFGS specification text,
> (4) Edit blank bracketed options to include requirements that exercise prudence and adherence to acceptable industry standards,
> (5) Comply with the directions, directives, and requirements of all UFGS Criteria Notes. The UFGS Criteria Notes are typically bordered on the top and bottom by a line of asterisks to highlight their location . . . .

(R4, tab 1.0 at 643 (emphasis in original))

36.  The final design submitted by Sauer addressed press-connect and soldered fittings.  Part 2.1.1 of the final design, Pipe Joint Materials, set forth the requirements for all of the pipe joint materials, which included the materials for solder and press-connect fittings (app. supp. R4, tab 4.2 at 4027-28).  Part 3.1.2.4, Copper Tube and Pipe, addressed the requirements for brazed, soldered, copper tube extracted joint, and copper and copper alloy press connect fittings (app. supp. R4, tab 4.2 at 4042).  For example, both parts stated the following for press-connect fittings:  copper and copper alloy press fittings "shall conform to material requirements of ASME B16.18 or ASME Bl6.22" (app. supp. R4, tab 4.2 at 4028, 4042).  These sections of the document did not state that press-connect fittings would be used, they merely explained the material or other requirements if they were used on the project.

11

37.  As noted above, the final design also stated that the "[m]aterials for the various services shall be in accordance with TABLES I and II" (app. supp. R4, tab 4.2 at 4026).  Table II, Pipe and Fitting Materials for Pressure Piping Systems, states the following:

| Item No. | Pipe and Fitting Materials | Service A | Service B | Service C | Service D |
|---|---|---|---|---|---|
| 2 | Wrought copper and bronze solder-joint pressure fittings, ASME B16.22 for use with Item 8 | X | X | | X |
| 3 | Cast copper alloy solder-joint pressure fittings, ASME B16.18 for use with Item 8 | X | X | | X |

Press Fittings:
A - Cold Water Service Aboveground
B - Hot and Cold Water Distribution 180 degrees F Maximum Aboveground
C - Rainwater harvesting distribution piping (water closets)
D - Cold Water Service Belowground

(App. supp. R4, tab 4.2 at 4059-60)  There was no "Item 8" in the table.  In addition, it is interesting to note that the initial design also included the following, which is conspicuously absent in the final design:

12

| Item No. | Pipe and Fitting Materials | Service A | Service B | Service C | Service D |
|---|---|---|---|---|---|
| 4 | Press connect fittings: copper and copper alloy press fittings, ASME B 16.18, ASME B16.22. | X | X | | X |

(R4, tab 2 at 2382)

38. Neither party specifically discussed the initial and final design specifications as it relates to this issue. We find upon review that although the final design set forth standards and requirements if press-connect fittings were used, Table II did not state that Sauer was to use press-connect fittings for pressure piping systems. Further, although Table II references ASME B16.18, which is a material requirement for press-connect fittings, the table states that it would be used for Item 8, and there is no Item 8. Therefore, Table II stated that only soldered fittings would be used. If the final design permitted press-connect fittings, it would have specifically and more clearly stated so, as it did in the initial design.

39. On June 10, 2015, Sauer issued RFI 79 requesting the government "confirm that press fittings are acceptable [] for copper piping. They are allowed by the specifications and have been approved by the [designer of record] but it is our understanding that this method is not being allowed on some facilities" (R4, tab 2 at 2398).

40. On June 12, 2015, NAVFAC's mechanical engineer Daniel Crosby responded in writing as follows:

> It is [our] policy that copper domestic water piping is to have soldered or brazed fittings only. UFGS 22 00 00 section 2.1.1 contains a designer's note which states "NOTE: Do NOT use the following paragraph for Navy projects" before the

13

paragraph describing press fittings. Provide soldered or
brazed fittings for all copper piping.

(R4, tab 2 at 2398)[8]

41. In addition, according to Sauer, on June 13, the contracting officer verbally responded to Sauer's RFI 79 (app. reply br. at 15).

42. On June 15, Sauer emailed NAVFAC construction manager Brandon Wade and stated that the specifications permitted press fittings (app. supp. R4, tab 4.13 at 4298). Sauer included in its email a statement from a Hankins & Anderson engineer who argued that the project requirements were set forth in the solicitation and not the UFGS unless the UFGS specification was specifically incorporated into the solicitation as a project requirement. According to the Hankins & Anderson engineer, the solicitation did not include a reference to UFGS specification section 22 00 00 as a project requirement and therefore the designer of record could edit the specification in any way, as long as it did not violate code or the solicitation. (App. supp. R4, tab 4.13 at 4299)

43. On June 24, Sauer sent a letter to the NAVFAC construction manager Brandon Wade and stated again that Sauer believed the solicitation permitted press-on fittings and that the issue was impacting the schedule (app. supp. R4, tab 4.13 at 4313-14). Sauer admitted that it was NAVFAC's policy to use brazed or soldered fittings but argued that press-on fittings were allowed under the solicitation and Sauer intended to use them (app. supp. R4, tab 4.13 at 4314).

44. On July 13, Brandon Wade confirmed NAVFAC's position regarding the use of soldered fittings instead of press-on fittings (app. supp. R4, tab 4.13 at 4328-29).

45. On July 29, Sauer again sent a letter to Brandon Wade and argued that the task order permitted the use of press-on fittings and that if the government changed the requirement to require soldered fittings, there would be a cost of $306,535, and a schedule impact. Sauer stated that it intended to proceed with pressed fittings unless the government issued a clear directive otherwise. (App. supp. R4, tab 4.13 at 4331-32)

46. On August 13, 2015, the contracting officer sent a letter to Sauer stating that it is NAVFAC's "policy that press-on fittings are not permitted on any project and that all fittings for copper tube and pipe shall be solder type fittings." The contracting officer

---

[8] The Navy did not provide a copy of the UFGS for the record. Rather, the Navy states that the UFGS can be found at the WBDG website and the current specification shows that UFGS 22 00 00 was revised to allow press fittings/press connections for Navy projects starting in 2018 (gov't br. at 17 n.1 (*citing* www.wbdg.org/ffc/dod/unified-facilities-guide-specifications-ufgs/ufgs-22-00-00)).

further stated that the ESR "neither allows nor prohibits the use of press-on fittings" and the PTS mentions press-on fittings in section D20. The contracting officer stated that since the ESR does not mention press-on fittings, they "should not be considered to be allowed by" the PTS. The contracting officer also stated:

> Furthermore, Part 2 [general requirements] Section 01 33 10.05 20 of the RFP clearly describes the order or precedence of the RFP and indicates that Part 2 overrides Part 4 in the event of a conflict or inconsistency . . . . Part 2 of the RFP also states that the contractor must provide design specifications and edit the UFGS sections in accordance with RFP Part 4, PTS Section Z-10, and Design Submittals . . . . Part 4, PTS Section Z-10 states that the Designer of Record (DOR) shall edit the UFGS sections for the project and shall comply with the directions, directives, and requirements of all UFGS Criteria Notes . . . . UFGS Section 22 00 00 contains a UFGS Criteria Note which directs the editor to delete press fittings for Navy projects . . . . Therefore, the DOR was required to delete press-on fitting[s] from the specifications for this project.

(App. supp. R4, tab 4.13 at 4335)

47. On August 27, 2015, the contracting officer reconsidered her decision regarding press-on fittings and stated they would be allowed as long as the contractor provided the press fitting tool to the government at no cost. The contracting officer stated that Sauer could still "use soldered fittings as described in the" solicitation but may use the press fittings if preferred, "as long as it is at no cost to the government." (App. supp. R4, tab 4.13 at 4338)

Count III – Balancing Dampers

48. With respect to the building's HVAC system, the ESR stated at paragraph D304001 that Sauer must:

> Provide factory assembled air volume balance dampers with solid shafts and end bearings in all branch ducts. All air volume balance dampers shall be accessible. If air volume balance dampers are located above hard ceilings (*i.e.*, plaster, etc.), provide lockable access panels to allow adjustment of dampers. Provide adjusting handles for volume dampers with rods of sufficient stand-off length such that the handle does not compress the duct insulation.

15

(R4, tab 1.0 at 262) The PTS stated the following with respect to volume dampers at paragraph D304001: "[p]rovide manual volume dampers in each branch take-off from the main duct to control air quantity except for primary supply ductwork on [variable air volume] systems . . . . " (R4, tab 1.0 at 519). Accordingly, the task order required the installation of balance dampers in every branch duct—a duct that is off of the main duct—and does specifically say where in the duct, as long as they are in a location that makes the damper accessible.

49. Comment 813275 in the project's ProjNet system, dated June 23, 2014, addressed balancing dampers. According to Daniel Crosby's comment, on behalf of the NAVFAC Mechanical Acceptance Group, the "[m]anual balancing dampers are required to be installed in all branch ducts serving the diffusers, grilles, etc." (R4, tab 2 at 2445).

50. The meeting minutes prepared by Hankins & Anderson for the July 9, 2014 meeting with NAVFAC also addressed Comment 813275 regarding balancing dampers. The meeting minutes state that NAVFAC "prefer[s] to use integral opposed-blade dampers only if there is a manual damper somewhere along that duct. The [design/build] team notes that the sleeping unit exhaust small sub-ducts, and manual dampers are unlikely to fit, but we have provided a manual damper at the top of each shaft. Dan [Crosby] agrees with this approach and will close the comment." (R4, tab 2 at 2443)

51. The evaluation text for Comment 813275, submitted by Hankins & Anderson on July 11, 2014, states that "[i]ntegral dampers are used for fine adjustment of airflow at diffusers. The exhaust shafts have a balancing damper at the top of each riser to balance the flow for that riser." Daniel Crosby closed Comment 813275 on July 28, 2014. (R4, tab 2 at 2445)

52. In an email dated January 22, 2016, the NAVFAC mechanical acceptance engineer informed Sauer that "it is our opinion the manual dampers must be installed in all of the branch ducts to be in compliance with the RFP and to ensure the exhaust systems can be properly balanced the first time. Even though the [contractor] has stated they will install the dampers in the future if all the grilles cannot be properly balanced, past experience with this [contractor] and others tells us they will not install [the] dampers in the future" (R4, tab 2 at 2450).

53. In a memorandum dated January 28, 2016, the NAVFAC design supervisor recommended, as a result of a site visit, that Sauer install manual balancing dampers per the email of January 22 (R4, tab 2 at 2448).

54. On February 9, 2016, NAVFAC's Brandon Wade informed Sauer that "[b]alancing dampers are to be installed in all toilet and shower areas" (R4, tab 2 at 2446).

55. An email from Hankins & Anderson's engineer, dated February 26, 2016, to Sauer, stated:

> With regard to the dampers in the shower and toilet exhaust ducts, this issue was discussed during the design with the NAVFAC Mechanical Engineer, Dan Crosby. See the attached meeting minutes, and ProjNet Comment 813275. NAVFAC agreed that it was impractical to install dampers at these duct locations, and providing a damper at the top of the exhaust riser(s) was acceptable.

(R4, tab 2 at 2441)

56. On October 16, 2017, S&K wrote to Sauer and stated that the cost of installing balancing dampers in the toilet and shower exhaust ducts in the berthing room, which were not shown on the IFC drawings, was $34,088.76 (R4, tab 2 at 2453).

57. The appellant relies on ASI 007, ASI 008 or ASI 009 to support its arguments, but did not provide copies of the documents in the supplemental Rule 4 file. Rather, the appellant submitted as part of the record the interrogatories and requests for admissions it provided to the government and the government's responses relating to those ASIs. For example, the appellant requested that the government "[a]dmit that the document attached" as Exhibit L is a true and accurate copy of ASI 007, that Exhibit M is a true and correct copy of ASI 008, and that Exhibit N is a true and correct copy of ASI 009 (app. supp. R4, tab 4.10 at 4221-22). The government responded by referring to its response to request for admission 2 concerning Exhibit A, which essentially stated that if Sauer is offering the document as a supplement to the Rule 4 file, it is Sauer's obligation to ensure it is a true and correct copy, and that if Sauer believes it is not a true copy, then Sauer should discuss with agency counsel (app. supp. R4, tab 4.10 at 4216).

58. The appellant requested that the government "[a]dmit that Architect's Supplemental Instruction 007 has no requirement for dampers to be installed in the ducts above the showers and toilets," that ASI 008 requires fire dampers in the ducts, and that ASI 009 requires the installation of volume dampers in the ducts (app. supp. R4, tab 4.10 at 4221-22). The government responded by referring to its response to request for admission 3, which stated that Sauer should not seek an admission "regarding the verbatim text, or clear meaning, of a contemporaneous document that is already, or can easily be, included in the Rule 4 file for this case" (app. supp. R4, tab 4.10 at 4216).

59. Even if we found the government's responses above to be an admission, we have nothing in the record showing that any of these ASIs were signed or approved by the contracting officer. In fact, the only ASI in the record is a copy of ASI 004, discussed above, relating to PVC piping. According to ASI 004, an ASI is a supplemental instruction for how work will be performed. The ASI is created by the architect, VOA,

and provided to Sauer and its subcontractors. (R4, tab 2 at 2322) Neither the government's admissions nor appellant's references to ASIs 007-009 demonstrate that the government agreed to a variation in the task order regarding balancing dampers in branch ducts.

60. Further, there is nothing in the record demonstrating that installation of a balancing damper at the top of each riser of an exhaust shaft meets the requirement to install a balancing damper in every branch duct and we therefore find it does not, in fact, meet the task order requirement. Therefore, we find that Sauer did not meet the task order's requirements when it installed the balancing damper at the top of the riser of the exhaust shaft in the shower and toilet ducts, rather than in the actual branch duct.

Count VI - 44-day Time Extension

61. The original contract completion date was extended to November 22, 2016 via Mod. 14 (R4, tab 1 at 1290).

62. Sauer contends that the project was substantially completed on January 5, 2017 but cites no support for this statement.

DECISION

Count I - PVC Pipes for Above Ground Sanitary Systems

Sauer seeks a total of $302,330.57 for the removal and replacement of the PVC pipes (compl. ¶ 33). First, Sauer alleges that there was an error in the final design, which "inadvertently" eliminated the use of PVC for the above ground waste piping (compl. ¶ 10). Sauer argues that its subcontractor S&K issued ASI 004 to inform Daniel Crosby and NAVFAC of the error, and that Daniel Crosby, acting as NAVFAC's agent, used his implied authority to verbally and in writing assure Sauer and S&K that the use of PVC was acceptable (compl. ¶¶ 8-9, 11-12, 15; app. br. at 4-6, 19-20). Sauer further states that "[w]hile it is true that [Daniel Crosby] had no authority to change the terms of the [task order], he could not perform an integral part of his duty unless he had the authority to approve material submitted which necessitated that he determine that the materials were acceptable under the [task order]" (app. reply br. at 10).

Regardless of any alleged error in the final design, there is no doubt that the task order required Sauer to utilize cast iron piping for above ground sanitary waste piping systems (FOF ¶ 17). Further, any variation from this requirement required "government" approval (FOF ¶ 9). The issue presented is whether a Navy engineer, Daniel Crosby, could provide the required "government" approval.

When a contract expressly provides that only the contracting officer has the authority to change a contract (or task order), other government employees do not possess

18

actual express or implied authority to change the contract (or task order). *See Winter v. Cath-dr/Balti JV*, 497 F.3d 1339, 1345-46 (Fed. Cir. 2007); *Innoventor, Inc.*, ASBCA No. 59903, 17-1 BCA ¶ 36,798 at 179,358 (2017). As noted, Sauer's task order was subject to the terms and conditions of the MACC, which included clause 5252.201-9300, CONTRACTING OFFICER AUTHORITY, and FAR clause 52.243-4, CHANGES (FOF ¶ 2). These clauses state that only the contracting officer makes a modification or deviation in the work to be performed (FOF ¶¶ 2-3). In fact, clause 5252.201-9300 warns contractors that no understanding or agreement between the contractor and a government employee will be effective or binding on the parties (FOF ¶ 2). We conclude that the only individual that could provide the required government approval for a variation in the task order requirements was the contracting officer. As the NAVFAC mechanical engineer for the project, Daniel Crosby did not have the authority to verbally or in writing approve a variation in the task order requirement concerning cast iron piping (FOF ¶ 22). Even if he had the authority to decide whether materials were acceptable under the task order, this did not equate to the same authority to approve variations.

In addition, we note that with respect to ASI 004, this document did not specifically request a variation to the specification concerning the use of cast iron for above ground waste systems; instead, the document stated only that the specifications needed to be changed (FOF ¶ 20). Therefore, Daniel Crosby's statement that he did not have any issues with "it" cannot serve as an approval or agreement to vary the task order specifications here even assuming he had authority to do so (FOF ¶ 21).

Task Order Submittal Process

Second, Sauer argues that decisions regarding plumbing materials for the project did not require government approval but could be submitted to the designer of record for approval, as Sauer did here (app. br. at 20). Sauer argues that if the designer of record believed that the use of "PVC pipe would be a change to [task order] requirements it would have submitted S&K's submittal of the use of PVC to the Government for approval" (app. reply br. at 9-10).

Sauer's argument that it could use a plumbing submittal for materials to circumvent the task order's requirements for cast iron piping fails. We have established that government approval, specifically contracting officer approval, was required for variations from the task order requirements. Therefore, Sauer could not use its plumbing submittal for materials, which was not approved by the government, to vary the task order specifications requiring the use of cast iron for the above ground waste piping (FOF ¶ 25). While we agree that a design change could be approved by the designer of record and brought to the attention of the government before being incorporated into the design documents, the task order required that such a design change meet the minimum requirements of the solicitation and accepted proposal (FOF ¶ 9). The plumbing submittal Sauer issued here, showing the use of PVC instead of cast iron for the above

19

ground waste piping, did not meet the minimum requirements of the solicitation (FOF ¶ 25).

<u>Waiver and Estoppel of Strict Compliance Due to Constructive Acceptance</u>

Third, Sauer contends that NAVFAC officials were continuously present and routinely observed S&K's ongoing construction of the waste piping system using PVC and waited 16 weeks to direct Sauer to not use PVC pipe (app. reply br. at 5-7; app. br. at 23-24). Sauer argues this resulted in an unjustifiable delay by the government in informing Sauer that use of the PVC piping was prohibited by the task order and as a result, the government constructively accepted the work and waived its right to insist on strict compliance or is estopped from insisting on compliance (app. br. at 21, 25-28). The government argues that it did take action immediately upon learning of the issue and instructed Sauer to remove the non-compliant PVC pipe (gov't br. at 58-59).

The government is generally entitled to insist upon strict compliance with the contract specifications and to require correction of nonconforming work. *A.D. Roe Company, Inc.*, ASBCA No. 48782, 99-2 BCA ¶ 30,398 at 150,287. There are instances, however, where the government may waive strict compliance with contractual requirements and is estopped from later re-imposing those requirements upon the contractor. *Watts Constructors, LLC*, ASBCA No. 61493, 20-1 BCA ¶ 37563 at 182,387 (*citing Gresham & Co. v. United States*, 470 F.2d 542, 554 (Ct. Cl. 1972) ("There can be no doubt that a contract requirement for the benefit of a party becomes dead if that party knowingly fails to exact its performance, over such an extended period, that the other side reasonably believes the requirement to be dead"); *Worldwide Parts, Inc.*, ASBCA No. 38896, 91-2 BCA ¶ 23,717 at 118,712; *Walsky Constr. Co.*, ASBCA No. 36940, 90-2 BCA ¶ 22,934 at 115,125; *see also Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 687-88 (1994). These cases require knowing failure to exact performance—presumably by one with authority to waive contractual terms.

Here, only the contracting officer could vary the task order requirements. Therefore, to establish waiver, Sauer must demonstrate that the contracting officer knowingly rescinded the government's right to require compliance with a task order minimum requirement. *ECC International, LLC*, ASBCA No. 58875, 20-1 BCA ¶ 37,683 at 182,966 (internal citations omitted). Even assuming government personnel on site may have observed the installation and use of PVC pipe, there is no evidence that the contracting officer knowingly waived the task order requirement. *Cf. American West Constr., LLC*, ASBCA No. 61094, 18-1 BCA ¶ 36,935 at 179,946 (administrative contracting officer and quality assurance representative were aware of and agreed to contractor's decision to use levee instead of temporary bridges).

In addition, the record shows that the NAVFAC construction manager tried to work with Sauer upon realizing PVC and not cast iron pipe had been used. Specifically, the record shows that in August, the NAVFAC construction manager expressed concern

20

with the use of PVC instead of cast iron pipe for the above ground waste system (FOF ¶ 26). In late August, the contracting officer instructed Sauer to remove the non-compliant PVC pipe (FOF ¶ 28). Accordingly, there was no unjustified delay by the government in requiring Sauer to comply with the task order requirement. *Cf. Brand S Roofing*, ASBCA No. 24688, 82-1 BCA ¶ 15513 (finding unjustified delay where government officials, including contracting officer, discovered noncompliance in April and waited until July to inform appellant). Ultimately, the contracting officer issued Mod. 14, which permitted the use of PVC pipe for underground sanitary waste systems but not above ground sanitary waste systems (FOF ¶ 30). The record does not demonstrate that the government engaged in affirmative misconduct.

Economic Waste Doctrine and Public Interest

Fourth, Sauer argues that removing the less expensive PVC piping and replacing it with the required cast iron pipe violated the FAR's Inspection of Construction clause and regulation, and therefore violated the economic waste doctrine (compl. ¶ 19; app. br. at 28-30). Sauer argues that PVC and cast iron piping are functionally equivalent because both remove wastewater and other waste product from the plumbing system in the barracks building (app. reply br. at 8).

Although, as noted, the government generally has the right to insist upon performance in strict compliance with the specifications of a contract or task order, the courts and boards have recognized that there are cases where it would be economically wasteful to require strict compliance if the work is acceptable for its intended purpose. *See Granite Constr. Co. v. United States*, 962 F.2d 998, 1007 (Fed. Cir. 1992); *Shirley Constr. Corp.*, ASBCA No. 41098, 93-3 BCA ¶ 26,245 at 130,557 (government should not be permitted to require replacement under the Inspection of Construction clause if the installed product substantially complied with the specifications and removal would result in economic waste). To establish economic waste, the work performed must substantially comply with the specifications; the work must be adequate for the intended purpose; and the cost of correction must be economically wasteful. *M.A. DeAtley Constr., Inc. v. United States*, 75 Fed. Cl. 575, 582 (2007); *see also*, FAR 52.246-12(f). Economic waste does not *ipso facto* excuse non-performance but serves to limit excessive damages for repair of non-conforming work. *Valenzuela Eng'g, Inc.*, ASBCA Nos. 53608, 53936, 04-1 BCA ¶ 32,517 at 160,852 (citation omitted).

We conclude that Sauer did not substantially comply with the specifications here, which required the use of cast iron pipe for the above ground waste system. The record shows that the government was concerned with the noise level of waste water traveling through the PVC in the above ground waste piping of the barracks but was open to an alternative solution. There is nothing in the record showing that Sauer or S&K solved this issue and offered a remedial measure to ensure the PVC would provide a similar level of sound protection to the cast iron pipe. In fact, although Sauer downplays the issue, it does admit "that cast iron pipe may be a bit less noisy than PVC pipe when

wastewater and waste product is flushed down a toilet," (app. reply br. at 8), and the record shows that Sauer itself found an article noting that the greatest issue with PVC pipe is sound transmission. Moreover, the Corps did not require Sauer to remove the PVC pipe for the below ground system, further demonstrating that the Corps was not arbitrary and capricious in its direction regarding the use of PVC pipe. *See Buck Town Contractors & Co.*, ASBCA No. 60939 *et al.*, 20-1 BCA ¶ 37,486 at 182,087 (government did not require Buck Town to degrade and rebuild the entire reach for levee).

### Count II - Press-On Fittings and Count V(a) – Extended Overhead Due to Unreasonable Delays

Sauer argues that it is entitled to an equitable adjustment under the Changes clause because the government delayed production for an unreasonable period of time before ultimately determining that press-on fittings were acceptable per the plain language in the solicitation (app. br. at 35-36). Sauer argues the government breached its implied obligation not to hinder or delay Sauer in the performance of its work (*id.* at 36). Sauer requests, on behalf of itself and S&K, a total of $107,415.58 for the costs incurred for the overtime labor, unabsorbed overhead expenses, and a time extension of 48 days for completion of the project (*id.* at 34; compl. ¶¶ 50-53, 66).

A finding of breach of the implied duty of good faith and fair dealing will demonstrate a change to the contract. *Fireman's Fund Ins. Co. v. United States*, 92 Fed. Cl. 598, 674 (2010). "Both the duty not to hinder and the duty to cooperate are aspects of the implied duty of good faith and fair dealing." *Id.* at 675 (*quoting Precision Pine & Timber, Inc. v. United States,* 596 F.3d 817, 820 n.1 (Fed. Cir. 2010)). The government breaches these duties when it acts unreasonably under the circumstances, such as when the government unreasonably delays the contractor or unreasonably fails to cooperate. *Id.* (citations omitted).

Here, the ESR did not specifically preclude or permit the use of press-on fittings for the copper tubing (FOF ¶ 31). The PTS that corresponded to the ESR paragraph at issue here did specifically allow for the use of press-on fittings for buried copper tubing (FOF ¶ 32). The final design, which was approved by Sauer, did not specifically state that press-on fittings would be used (FOF ¶ 38). Rather, the document only clearly showed that soldered fittings would be used (*id.*). As noted, variations from the final design required government approval. That is likely why Sauer issued the RFI on June 10, and asked the government to confirm that press fittings were acceptable for copper piping.

The government responded two days later in writing and stated that its policy is to only use soldered or brazed fittings with copper domestic water piping as a result of UFGS, which was incorporated into the task order requirements (FOF ¶ 40). Sauer states that the contracting officer verbally responded three days later (FOF ¶ 41).

Sauer proceeded to disagree with the Navy despite the fact that Sauer's final design was consistent with the government's interpretation (FOF ¶¶ 42-43, 45). Therefore, Sauer's decision to wait two months for approval to use press-connect fittings is not the fault of the government. The task order permitted soldered fittings, the design document stated clearly only that soldered fittings would be used, and the government's direction to use soldered fittings two days after Sauer issued the RFI does not evidence a lack of good faith and fair dealing on the part of the government. Sauer's decision to wait until the agency reconsidered its original position is just that – Sauer's decision. We conclude that the government did not cause a delay here. *Cf. Fireman's Fund Ins. Co.*, 92 Fed. Cl. at 679 (Corps gave first informal response 51 days and written response 71 days after contractor issued RFI).

### Count III – Balancing Dampers

Sauer claims that the government directed Sauer and S&K to install dampers which were not required under the task order (app. br. at 37). Sauer argues it is entitled to $39,008.38 for costs incurred due to this constructive change (app. reply br. at 18; compl. ¶ 83). Specifically, Sauer contends that although the RFP required dampers in all branch ducts, there was no specific requirement to install dampers in the ducts above the shower and toilet areas because neither the final project specifications nor drawings required dampers in those areas (app. br. at 37). Essentially, Sauer has argued that even though the RFP and specifications required balancing dampers in all branch ducts, the government "changed this requirement" under the authority of the Changes clause, and then "after having changed the [task order] to eliminate the requirement for these dampers, [and] accepted the ducting system as built," the government changed the requirement again to require balancing dampers (app. br. at 38-39).

The task order required Sauer to install balancing dampers in all branch ducts (FOF ¶ 48). Sauer did not initially provide balancing dampers in the branch ducts that are above the shower and toilet area (FOF ¶ 55). Rather, Sauer installed balancing dampers at the top of each riser of an exhaust shaft, which did not meet the task order requirement. Further, although Sauer contends that the government agreed to this change via the design drawings prepared by Sauer, the record contains nothing to support this contention—not the ASIs, the drawings, or an approval by the government (FOF ¶ 59). Rather, we have only a document in the record showing that Daniel Crosby closed Comment 813275 in the project's ProjNet system, dated June 23, 2014, which addressed balancing dampers, and that Mr. Crosby closed this comment after Hankins & Anderson commented that "[i]ntegral dampers are used for fine adjustment of airflow at diffusers. The exhaust shafts have a balancing damper at the top of each riser to balance the flow for that riser" (FOF ¶ 51).

As discussed above, any variation to the task order required government approval. There was no government approval here and Daniel Crosby, as the NAVFAC mechanical

engineer for the project, did not have the authority to verbally or in writing approve a variation in the task order requirement. Because the government did not change the requirement that Sauer provide balancing dampers in the branch ducts, there was no change when the government required Sauer to adhere to the task order requirements.

### Count VI - 44-Day Time Extension

Finally, Sauer seeks a 44-day extension of time to its contract completion date as a result of the Navy's design changes and general interference with the task order. Sauer argues that it was granted a time extension to November 22, 2016 and the project was substantially complete on January 5, 2017 (and no liquidated damages have thus far been assessed) (app. br. at 43; app. reply br. at 18). Since Sauer has settled two claims and we have denied the remaining claims, we have no basis to conclude that Sauer is entitled to a 44-day time extension.

### CONCLUSION

Based on the foregoing, the appeal is sustained in part with regard to Count IV (Condenser Water Loop) and Count V(b) (Mod. 004 Electrical Equipment Change (extended overhead)), the remainder is denied.

Dated: September 29, 2021

LAURA EYESTER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

24

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 61847, Appeal of Sauer, Inc., rendered in conformance with the Board's Charter.

Dated: September 29, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals